UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| ANDREA K. SAVIDGE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 3:17-CV-186-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| PHARM-SAVE, INC., d/b/a NEIL | ) | **AND ORDER** |
| MEDICAL GROUP, et al., | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\*    \*\*\*    \*\*\*    \*\*\*

This matter is before the Court on two motions. First, Defendant Pharm-Save, Inc.

("Pharm-Save") filed a Motion for Partial Summary Judgment on Plaintiffs' Negligence Claim

("Motion for Partial Summary Judgment"). [R. 197]. Plaintiffs Andrea K. Savidge and Beth A.

Lynch filed a response to that motion, [R. 207], and Pharm-Save replied. [R. 210]. Next, Pharm-

Save filed a Motion to Alter or Amend Order Granting Class Certification or, in the Alternative,

to Bifurcate the Issue of Damages ("Motion to Alter or Amend"). [R. 198]. Plaintiffs responded

to that motion, [R. 209], and Pharm-Save has filed a reply. [R. 211]. Both motions are therefore

fully briefed and ripe for review. For the reason set forth herein, the Court will deny Pharm-

Save's Motion for Partial Summary Judgment, [R. 197], and grant in part and deny in part

Pharm-Save's Motion to Alter or Amend. [R. 198].

## I. BACKGROUND

The Court provided a detailed summary of the factual and procedural background of this

case in its March 31, 2023 Memorandum Opinion and Order, [R. 166, pp. 2–3], and its March

29, 2024 Memorandum Opinion and Order, [R. 190, pp. 2–7]. The Court recites the relevant

portions herein.

Plaintiffs Andrea Savidge and Beth Lynch, both Kentucky residents at all relevant times, were employees of Pharm-Save, a corporation organized under the laws of North Carolina with its principal place of business in the state of North Carolina, from 2013 to 2015 and from 2013 to 2014, respectively. [R. 1-1, ¶¶ 3, 7–8 (Original Complaint)].[1] On March 3, 2016, after their employment had ended, Plaintiffs' "sensitive and personal information contained in their Form W-2 Wage and Tax Statement(s) was compromised via a data security breach." *Id.* ¶ 11. This data breach occurred when Pharm-Save fell victim to a phishing scheme perpetrated by cybercriminals. *Id.* ¶ 22. According to the Second Amended Complaint, one or more Pharm-Save employees released Plaintiffs' personally identifiable information ("PII") to cybercriminals posing as company executives. *Id.*

Pharm-Save promptly notified affected employees, including Lynch and Savidge, by letter. *Id.* ¶ 23; *see also id.* at 21–23 (Letter to Lynch), 24–26 (Letter to Savidge).[2] In the letters, dated March 24, 2016, Pharm-Save explained the security breach and offered employees a complimentary two-year membership with an identity protection service. *Id.* at 21–26. Later that month, Savidge was notified by the Internal Revenue Service ("IRS") that a fraudulent tax return had been filed in her name. *Id.* at 28–29 (IRS Letter). Other employees also had fraudulent tax returns filed in their names shortly after the breach, as evidenced by the deposition testimony of record. *See* [R. 179-3, pp. 98:18–23, 99:1–9, 115:1–14, 116:22–23, 117:1–16 (Houghton

---

[1] In Plaintiffs' Second Amended Complaint, the operative pleading, Plaintiffs "repeat[] and re-allege[]" the legal and factual assertions contained in their First Amended Complaint. [R. 104, ¶ 1]. The First Amended Complaint, in turn, "repeat[s] and re-allege[s]" the legal and factual assertions in the Original Complaint. [R. 27, 1].

[2] The Court refers to the page number assigned by the Court's electronic docketing system.

Depo.)]; [R. 179-16, pp. 114–115, 122–123, 138:10–14, 143:21–23, 144:1–2, 173:1–10 (Chad Benfield Depo.)].[3]

In 2017, Plaintiffs sued Pharm-Save and Neil Medical Group, Inc. in Kentucky state court, alleging several causes of action related to the theft of their PII. [R. 1, p. 2; see also [R. 1-1, pp. 2–19 (Original Complaint)]. Among other things, the plaintiffs alleged that they suffered damages, including "expense associated with mitigating the risk of identity theft and lost time attendant to those mitigation efforts." [R. 1-1, ¶ 33].

Pharm-Save timely removed the action to this Court, [R. 1], and simultaneously filed a motion to dismiss. [R. 5]. On December 1, 2017, the previously assigned district judge granted the motion in part, finding, among other things, that Plaintiffs' allegations about heightened risks and the possibility of future harm (i.e., that cybercriminals *may* misuse their PII in the future), without more, were insufficient to plead a cognizable injury. [R. 26, p. 7]. However, the Court found that the plaintiffs' allegations that they suffered out-of-pocket expenses to monitor and manage the data breach were sufficient to allege a cognizable injury to support their negligence claim. *Id.* at 11–12. This ruling left only two live claims: negligence and breach of implied contract. *See generally id.* at 27. The Court also granted Plaintiffs' motion for leave to file an amended complaint.[4] *Id.* at 28.

Plaintiffs filed an amended complaint reasserting their claims for negligence and breach of implied contract and advancing four new legal theories centered on Pharm-Save's alleged mishandling of Plaintiffs' PII: trade secret misappropriation, conversion, trespass to chattels, and

---

[3] When citing to these or other depositions, the Court refers to the page number of the deposition page, rather than the page number assigned by the Court's electronic docketing system.

[4] The Court also denied the motion to dismiss without prejudice to the extent Neil Medical Group Inc. sought dismissal for lack of personal jurisdiction, and it allowed the parties to conduct limited discovery on that issue. [R. 26, p. 27].

bailment. *See* [R. 27 (First Amended Complaint)]. Pharm-Save[5] then moved to dismiss the four new counts in the First Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure [R. 30], which the Court granted. *See* [R. 72]. After this ruling, only two claims remained: negligence and breach of implied contract.

With leave from the assigned magistrate judge, [R. 103], Plaintiffs filed their Second Amended Complaint on July 1, 2021, raising two new causes of action: violations of the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") and intrusion upon seclusion. [R. 104 (Second Amended Complaint)]. Thus, at that time, Plaintiffs raised four claims: negligence, breach of implied contract, NCUDTPA violations, and intrusion upon seclusion. As for the requested damages, Plaintiffs appeared to reallege their allegations regarding lost time and mitigation efforts. *See id.* ¶ 1 (repeating and realleging the allegations in their earlier complaints)]; [R. 1-1, ¶ 33]. Plaintiffs also alleged that they suffered "significant mental anguish due to the increased risk of identity theft that they have been exposed to by" Pharm-Save's actions. [R. 104, ¶ 3].

Pharm-Save then filed a Motion for Summary Judgment, [R. 110], seeking summary judgment on all claims involving a speculative increased risk of future harm. On November 8, 2021, the Court denied that motion. [R. 122]. The Court explained that, under the law-of-the-case doctrine, the Court's December 1, 2017 Memorandum Opinion and Order dictated its decision on the Motion for Summary Judgment. *See id.* at 4–7. Thus, the Court held that, for Plaintiffs to have standing to seek damages for an increased risk of future harm, they first needed to show that they were entitled to damages for out-of-pocket expenses. *See* [R. 166, p. 30

---

[5] The Motion to Dismiss, [R. 30], was jointly filed by Pharm-Save and Neil Medical Group. However, following limited discovery, Neil Medical Group renewed its motion to dismiss for lack of personal jurisdiction. [R. 51]. The Court granted that motion, [R. 69], leaving Pharm-Save as the only defendant in this matter.

(discussing its November 8, 2021 Memorandum Opinion and Order)]. Accordingly, the Court found that the plaintiffs were permitted to pursue damages for risk of future harm for any cognizable injuries suffered, so long as they could satisfy the required evidentiary burden. [R. 122, pp. 7–8].

Several months later, Pharm-Save sought summary judgment on the NCUDTPA claim, [R. 135], the intrusion upon seclusion claim, [R. 136], and on Plaintiffs' claimed damages for increased risk of future harm, [R. 137]. Plaintiffs, meanwhile, filed a motion for class certification, [R. 144]. The Court addressed these and other motions[6] in a March 31, 2023 Memorandum Opinion and Order. [R. 167]. The Court granted summary judgment in favor of Pharm-Save on the NCUDPTA and intrusion upon seclusion claims. *Id.* at 5–27. However, it denied without prejudice Pharm-Save's Motion for Partial Summary Judgment on the damages issue. *Id.* at 27–31. On that issue, the Court found that it had erred, in part, when it previously ruled on the increased-risk-of-future-harm issue in November 2021. *Id.* at 29. The Court explained that,

> so long as Plaintiffs can show they are at a material risk of concrete harm, and that they have suffered any other harm from that risk—not, as the Court previously held, out-of-pocket expenses specifically—they may be entitled to damages for an increased risk of future harm if they make a sufficient showing of that entitlement at trial.

*Id.* at 30–31.

Having clarified this point, the Court denied Pharm-Save's motion without prejudice, as both the motion and the responsive briefs had been informed by the Court's earlier rulings. *Id.* at 31. The Court likewise denied without prejudice the plaintiffs' motion seeking class certification,

---

[6] Though not relevant here, the Court also addressed to motions seeking to exclude expert testimony, [R. 138, R. 139], and a motion for oral argument. [R. 160].

noting that the Court's dismissal of the NCUPTPA and intrusion upon seclusion claims could affect the certification analysis.

Pharm-Save ultimately renewed its motion for partial summary judgment on the issue of damages for increased risk of future harm, arguing that the plaintiffs lacked standing to pursue such damages,[7] [R. 167], and Plaintiffs renewed their request for class certification, [R. 169]. By Memorandum Opinion and Order dated March 29, 2024, the Court denied Pharm-Save's Renewed Motion for Partial Summary Judgment and granted Plaintiff's Renewed Motion for Class Certification.[8] [R. 190].

In doing so, the Court provided a detailed overview of general standing requirements under Article III, specifically the injury-in-fact requirement, and case law discussing injuries based on future harm. *Id.* at 10–21. The Court explained that a plaintiff may demonstrate an injury in fact based on a future risk of harm, so long as that future harm is sufficiently imminent (i.e., likely to occur) and concrete (i.e., having a close relationship with a harm traditionally recognized as providing a basis for a lawsuit in American courts). *Id.* at 20–21. And importantly, in a suit for damages, the plaintiff must demonstrate that "the risk of future harm materialized," or the exposure to that risk caused "some other injury," i.e., a present and concrete harm, which can include emotional damage, mitigation costs, or lost time. *Id.* at 21 (citations omitted). The Court found that Plaintiffs satisfied this injury-in-fact requirement for their future-harm damages. *See, e.g.*, *id.* at 41–42. Specifically, they had demonstrated a substantial risk that future harm (i.e., identity theft or fraud) will occur, and that harm was analogous to harms recognized at

---

[7] As the Court explained in its March 29, 2024 Memorandum Opinion and Order, Pharm-Save did not couch its argument as an attack on standing, but that was the only plausible reading of its motion. [R. 190, p. 10 n.8].

[8] The Court also granted the parties' requests to file excess pages in support of their motions, [R. 170], [R. 177], and denied Plaintiffs' request for oral argument. [R. 188].

common law, like the disclosure of private information. *Id.* at 41. Moreover, Plaintiffs had presented two present concrete harms resulting from this risk of future harm: mitigation costs and lost time. *Id.*

This analysis also informed the Court's decision on Plaintiff's Renewed Motion for Class Certification. The Court granted that motion, finding that the requirements of Federal Rule of Civil Procedure 23 were satisfied. *Id.* at 45–67. First, however, the Court modified the Plaintiffs' proposed class definition "to ensure that each class member may ultimately demonstrate standing (i.e., a cognizable injury in fact), and to avoid eventual 'predominance' issues" under Rule 23(b)(3). *Id.* at 45. It defined the class as follows:

> All persons who, like ANDREA SAVIDGE and BETH A. LYNCH, were the victims of the Pharm-Save data security breach that occurred on or about March 3, 2016, wherein their sensitive and personal data was compromised, and who suffered an actual, present injury from the breach, or who otherwise incurred costs or lost time mitigating the risk of future harm resulting from that data breach.

*Id.* As to this class, two claims remained: negligence and breach of implied contract.

Several motions followed. First, Pharm-Save filed the presently pending Motion for Partial Summary Judgment, [R. 197], and Motion to Alter or Amend, [R. 198]. In the former, Pharm-Save seeks summary judgment on Plaintiffs' common law negligence claim, arguing that North Carolina law governs, and under that state's laws, there is no duty for an employer to safeguard its employees' PII. *See* [R. 197]. Then, in its Motion to Alter or Amend, Pharm-Save asks this Court to modify the class definition to remove any references to injury, or alternatively, to bifurcate the issue of damages. *See* [R. 198]. Plaintiffs then sought to strike the Motion for Partial Summary Judgment, as well as an affidavit submitted in support of the Motion to Alter or Amend. [R. 199 (Motion to Strike)]. The Court denied Plaintiffs' Motion to Strike but granted their request for an extension of time to respond to Pharm-Save's motions. [R. 204 (Order)].

Plaintiffs have now filed their responses, [R. 207], [R. 209-2], and Pharm-Save replied. [R. 210]; [R. 211]. Accordingly, Pharm-Save's Motion for Partial Summary Judgment, [R. 197], and Motion to Alter or Amend, [R. 198], are now ripe for review.

## II. ANALYSIS

### A. Pharm-Save's Motion for Partial Summary Judgment, [R. 197]

#### 1. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment if it first finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Anderson*, 477 U.S. at 256. That burden may be satisfied by demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case for which he or she bears the burden of proof. *Celotex Corp.*, 477 U.S. at 323. Once the moving party satisfies this burden, the non-moving party thereafter must produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted). "The evidence of the non-movant is to be believed, and all

justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, the Court is not obligated to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.* Moreover "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Ultimately, if the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, then there is no genuine issue of material fact and summary judgment is appropriate. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

### 2. Choice-of-Law Analysis

In its Motion for Partial Summary Judgment, Pharm-Save first argues that "North Carolina law should apply to the North Carolina members of the class." [R. 197-1, p. 6]. Because North Carolina law applies, Pharm-Save argues, the Plaintiffs' common law negligence claim must fail. *Id.* at 6–9. More specifically, Pharm-Save argues that North Carolina courts would be unlikely to recognize a common law duty for employers to safeguard their employees' PII. *Id.* In response, Plaintiffs insist that Kentucky law applies "to the entirety of this controversy," [R. 207, p. 15], and regardless, North Carolina courts "would likely hold that Pharm-Save owed a duty to its employees to safeguard the PII they entrusted to its care." *Id.* at 14.

As an initial matter, the Court briefly addresses Plaintiff's argument that Pharm-Save potentially waived its right to raise a choice-of-law concern. In a footnote, Plaintiffs state, "[T]he

fact that Pharm-Save has waited until *after* class certification to argue that North Carolina law applies to any part of the certified Class raises the question of whether Pharm-Save waived such an argument." [R. 207, p. 14 n.3 (citations omitted)]. But beyond raising this question in a single-sentence footnote, Plaintiffs expend no effort to discuss it. The Court therefore finds that, to the extent Plaintiffs wish to argue waiver, that argument is wholly undeveloped, and the Court need not consider it. *See Members Heritage Credit Union v. N.Y. Marine & Gen. Ins. Co.*, 5:21-CV-207-CHB, 2023 WL 4876383, at *13 (E.D. Ky. July 31, 2023) (explaining that the party's argument "is wholly undeveloped, and the Court need not consider it"); *Brown v. Astrue*, No. 09-387-HRW, 2010 WL 4878866, at *3 (E.D. Ky. Nov. 24, 2010) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (citing *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997))). Regardless, prior to class certification, courts generally "focus on application of the forum's choice of law rules to the named plaintiffs." *O'Bryan v. Holy See*, 556 F.3d 361, 381 n.8 (6th Cir. 2009) (citations omitted). Thus, it is not necessarily inappropriate for Pharm-Save to raise these individualized choice-of-law issues now, after the class has been certified.

Indeed, once a multi-state class has been certified, due process requires the Court to engage in individualized choice-of-law analyses for each plaintiff's claims, not just the named plaintiffs' claims. *Id.* (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 822–23 (1985)). The same is true when a plaintiff "argues for the application of one state's law to a multi-state class." *Corder v. Ford Motor Co.*, 272 F.R.D. 205, 208 (W.D. Ky. 2011) ("When a plaintiff argues for

the uniform application of one state's law to a multi-state class, we must ensure that such choice of law does not violate the principles set forth in [*Shutts*].").

Here, the class includes citizens of both Kentucky and North Carolina. *See* [R. 104 (Second Amended Complaint)]. Plaintiffs ask the Court to apply Kentucky law to the entire class and to all claims, not just the North Carolina members' negligence claims. [R. 207, p. 15 (arguing that the Court should "apply[] Kentucky law to the entire controversy")]. The Supreme Court has explained that, "where a plaintiff seeks to apply a single state's law in a multi-state class action, that state must have a 'significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary or unfair.'" *Corder*, 272 F.R.D. at 208 (quoting *Shutts*, 472 U.S. at 818). On the other hand,

> [i]n a class action where a large proportion of the claims of class members lack sufficient contacts or aggregation of contacts with the forum state, the application of the law of the forum state to every claim in the case would be so arbitrary and unfair as to be a violation of the Due Process Clause.

6A *Federal Practice, Lawyer's Edition*, § 12:7 (2025) (citing *Shutts*, 472 U.S. at 797).

In support of their argument that Kentucky has sufficiently significant contacts (or aggregation of contacts), Plaintiffs cite to the following: "the PII of more than thirty Kentucky citizens," of approximately 345 affected employees, was disclosed during the breach; the cybercriminals did not limit their request for W2s to North Carolina citizens; and Pharm-Save operates a location in Kentucky and is licensed by the Kentucky Board of Pharmacy. [R. 207, p. 17]. From this, Plaintiffs argue, without further explanation, that "the operations of Pharm-Save are so inextricably intertwined with its forum state activities that it cannot be said with positive assurance that the tort of one of its agents—for which it is strictly and vicariously liable—lacks a significant contact with the Commonwealth." *Id.* at 18. Pharm-Save, on the other hand, notes that the "inadvertent disclosure [of the PII] occurred in *North Carolina*, by a *North*

*Carolina* citizen, at a business with its principle place of business in *North Carolina*." [R. 210, p. 2 (emphasis in original)]. And, Pharm-Save points out, "the class is *overwhelmingly* made up of *North Carolina* citizens." *Id.* (emphasis in original).

For their part, Plaintiffs fail to cite any case law indicating that Pharm-Save's minimal contacts with Kentucky are sufficiently significant to warrant application of Kentucky law to North Carolina class members.[9] And given the limited nature of Pharm-Save's contacts with this state, the Court doubts whether Kentucky law should apply to the North Carolina class members. Stated another way, the Court is concerned that the application of Kentucky law to every claim in the case "would be so arbitrary and unfair as to be a violation of the Due Process Clause." 6A *Federal Practice, Lawyer's Edition*, § 12:7 (2025) (citing *Shutts*, 472 U.S. at 797).

However, the Court need not reach this issue. Even if there are insufficient contacts with the forum state, Kentucky law may still apply to the entire class so long as Kentucky law does not "conflict[] in a material way with that of other jurisdictions because '[t]here can be no [constitutional] injury in applying [Kentucky] law [to all plaintiffs' claims] if it is not in conflict with that of any other jurisdiction connected to this suit." *Corder*, 272 F.R.D. at 209 (quoting *Shutts*, 472 U.S. at 816). A true conflict of laws exists when "the applicable law from each jurisdiction provides different substantive rules, the differences are relevant to the issue at hand, and the differences must have a significant possible effect on the outcome of the trial." *French v. Essentially Yours Indus., Inc.*, No. 1:07-CV-817, 2008 WL 2788511, at *6 (W.D. Mich. July 16, 2008) (quoting *@Wireless Enters., Inc. v. AI Consulting, LLC*, No. 05-CV-6176 CJS(P), 2006 WL 3370696, at *4 (W.D.N.Y. Oct.30, 2006)) (internal quotations omitted).

---

[9] Neither party argues that North Carolina law should apply to the Kentucky plaintiffs, and as a result, the Court considers only whether Kentucky law should apply to the North Carolina plaintiffs.

In this case, Plaintiffs only address whether Kentucky law conflicts with North Carolina's negligence law, specifically its law on the applicable duty of care, and they make no mention of Kentucky or North Carolina law relating to their other claim, breach of implied contract. As a result, the Court will consider only whether there is a conflict of laws as to the negligence claim.[10] As to the applicable law, neither party disputes that Kentucky and North Carolina's negligence laws are substantially similar. *See, e.g.*, [R. 197-1 (noting that "North Carolina has similar negligence elements as Kentucky")]. In both states, the elements of negligence are (1) a legally-cognizable duty; (2) a breach of that duty; (3) causation; and (4) damages. *See Greer v. Kaminkow*, 401 F. Supp. 3d 762, 770 (E.D. Ky. 2019) (citing *Patton v. Bickford*, 529 S.W.3d 717, 729 (Ky. 2016)); *Royal v. Armstrong*, 524 S.E.2d 600, 602 (N.C. Ct. App. 2000). Nevertheless, the parties disagree as to whether North Carolina would recognize an employer's duty to safeguard its employees' sensitive personal information. *See* [R. 197-1, pp. 6–9]; [R. 207, pp. 18–23]; [R. 210, pp. 3–5].

In making their respective arguments, neither party directly addresses Kentucky law on this issue, but they appear to assume that Kentucky courts *would* recognize such a duty. And indeed, multiple federal district courts have denied motions to dismiss on this issue, finding that, under Kentucky law, the complaints at issue sufficiently alleged that the employer-defendants had a duty to take reasonable steps to safeguard the sensitive personal information that their employees were obligated to provide as conditions of their employment. *See Brooks v. Peoples*

---

[10] As previously noted, Plaintiffs state in their briefing that Kentucky law should apply "to the entirety of this controversy," [R. 207, p. 15]. But they have made no effort to discuss whether Kentucky law conflicts with North Carolina law on breach of implied contract, and the Court will not do their work for them. *See, e.g.*, *Brown*, 2010 WL 4878866, at *3 ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (citation omitted)). Accordingly, the Court will not go on to consider whether Kentucky law should apply to the entire class with respect to the breach of implied contract claim.

*Bank*, 732 F. Supp. 3d 765, 779 (S.D. Ohio 2024) (applying Kentucky law); *McKenzie v. Allconnect, Inc.*, 369 F. Supp. 3d 810, 818 (E.D. Ky. 2019) (same).

Having established Kentucky's position on this issue (and in the absence of any argument to the contrary by the parties), the Court turns to Pharm-Save's argument that North Carolina would decline to recognize an employer's duty to safeguard its employees' sensitive personal information. Pharm-Save acknowledges that North Carolina courts have not yet ruled on this issue. [R. 197-1, p. 7]. Therefore, this Court "essentially must attempt to place itself in the shoes of the [North Carolina Supreme Court] by 'predicting how that court would rule.'" *Haney v. Charter Foods N., LLC*, 747 F. Supp. 3d 1093, 1110 (E.D. Tenn. 2024) (quoting *Williams v. BMW of N. Am., LLC*, 514 F. Supp. 3d 1036, 1044 (E.D. Tenn. 2021)).

Pharm-Save insists that North Carolina would decline to recognize this duty. It first cites North Carolina's Identify Theft Protection Act, noting that the statute does not impose any duty on a North Carolina employer to protect its employees' personal information; instead, it only imposes a duty to notify employees of a data breach. [R. 197-1, p. 7 (citing N.C. Gen. Stat. Ann. § 75-65)]. Pharm-Save then goes on to note that other courts "have held that no duty of care exists in the context of data breaches," citing to case law from Pennsylvania, Illinois, New York, and California. *Id.* at 7–8. It relies primarily on *Dittman v. UPMC*, 154 A.3d 318 (Pa. Sup. Ct. 2017), in which Pennsylvania's intermediate appellate court declined to recognize an employer's duty of reasonable care in the collection and storage of its employees' personal information and data. *Id.* at 323–25. In reaching this conclusion, the court noted that the state legislature had only imposed a statutory duty to notify employees of a data breach, rather than a duty to protect the employees' sensitive private information. *Id.* at 324–25.

However, as Plaintiffs note, that decision was later vacated by that state's highest court. *See Dittman v. UPMC*, 649 Pa. 496 (Pa. 2018). The Supreme Court of Pennsylvania granted discretionary review in that case, specifically "to determine whether an employer has a legal duty to use reasonable care to safeguard its employees' sensitive personal information that the employer stores on an internet-accessible computer system." *Id.* at 499. The court noted that this was not a case involving imposition of a new, not previously recognized duty; rather, it involved the application of an already existing common law duty to a novel factual scenario. *Id.* at 512. As for the common law duty at issue, the Court noted that, "[i]n scenarios involving an actor's affirmative conduct, he is generally under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act." *Id.* at 513 (quoting *Seebold v. Prison Health Servs., Inc.*, 57 A.3d 1232, 1246 (Pa. 2012)) (cleaned up). In *Dittman*, the plaintiffs alleged that their employer, the defendant, had required them to provide personal and financial information, which it then collected and stored on its internet-accessible computer system, without using adequate security measures. *Id.* at 513. These acts constituted affirmative conduct on the employer's part, which in turn created the risk of a data breach. *Id.* at 513–14. As a result, the court found that the employer owed a duty to its employees to exercise reasonable care in collecting and storing the employees' personal and financial information. *Id.* at 516.

Despite the fact that the Supreme Court of Pennsylvania's *Dittman* decision directly contradicts its position and vacates the decision it previously relied on, Pharm-Save now argues that it "does not need [the now-vacated] *Dittman*" ruling. [R. 210, p. 4]. It cites instead to cases out of Georgia, Illinois, and Alabama, arguing that these states have declined to recognize an employer's duty to protect its employees' confidential information. *Id.*

- 15 -

The Court has reviewed the cases cited by Pharm-Save, in both its motion and its reply brief. Most are easily distinguishable and unpersuasive. For example, Pharm-Save cites to *Department of Labor v. McConnell*, 828 S.E.2d 352 (Ga. 2019), arguing that the Supreme Court of Georgia has "refused to recognize a broad, general common law duty to protect employees' personal information like Plaintiffs demand here." [R. 210, p. 4]. But the United States District Court for the Northern District of Georgia has since examined the *McConnell* case and other Georgia case law, and ultimately found that *McConnell* did not stand "for the broad proposition that a duty to safeguard personal information simply does not exist under Georgia law." *Tracy v. Elekta, Inc.*, 667 F. Supp. 3d 1276, 1284 (quoting *Purvis v. Aveanna Healthcare, LLC*, 563 F. Supp. 3d 1360, 1367 (N.D. Ga. 2021)). As a result, that court found that the defendants in that case owed the plaintiffs a duty to safeguard their information based on the foreseeable risk of a data breach. *Id.* at 1284–85; *see also Ramirez v. Paradies Shops, LLC*, 69 F.4th 1213, 1218–21 (11th Cir. 2023) (finding complaint adequately pleaded an employer's duty to protect the sensitive personal information of its employees).

Other cases cited by Pharm-Save are equally unpersuasive. In *Griggs v. NHS Mgmt., LLC*, SC-2023-0784, 2024 WL 4797211 (2024), for example, the trial court did not "dismiss[] due to a lack of duty," as Pharm-Save argues. [R. 210, p. 4]. Instead, the plaintiff had failed to cite anything more than the general elements of a negligence claim when defending against a motion to dismiss, and as such, her response brief had failed to comply with local rules requiring a party to cite to cases, statutes, or other authorities to support their position. *Griggs*, 2024 WL 4797211, at *3–4. And other cases cited by Pharm-Save fail to address the duty of care in the employer-employee context. *See In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 976 (N.D. Cal. 2016); *Worix v. MedAssets, Inc.*, 869 F. Supp. 2d 893, 897 (N.D. Ill. 2012); *Dolmage*

*v. Combined Ins. Co. of Am.*, No, 14 C 3809, 2015 WL 292947, at *6 (N.D. Ill. Jan. 21, 2015);

*Hammond v. Bank of N.Y. Mellon Corp.*, No. 08 Civ. 606(RMB)(RLE), 2010 WL 2643307, at *9

(S.D.N.Y. June 25, 2010).

Moreover, the Court finds persuasive the analysis of numerous courts that have recently

recognized an employer's duty to safeguard its employees' sensitive personal information in the

data breach context. *See Clemens v. ExecuPharm, Inc.*, 48 F.4th 146, 158–59 (3d Cir. 2022)

(discussing, in the context of standing, "an employer's duty to protect its employees' sensitive

information"); *Sackin v. TransPerfect Glob., Inc.*, 278 F. Supp. 3d 739, 747–48 (S.D.N.Y. 2017)

(applying New York law); *Mackey v. Belden, Inc.*, No. 4:21-CV-00149-JAR, 2021 WL 3363174,

at *6–7 (E.D. Mo. Aug. 3, 2021) (applying Missouri law); *In re Wawa, Inc. Data Sec.Litig.*, No.

19-6019, 2021 WL 1910887, at *7 (E.D. Pa. May 12, 2021) (applying Pennsylvania law);

*Portier v. NEO Tech. Sols.*, 3:17-cv-30111-TSH, 2019 WL 7946103, at *11–13 (D. Mass. Dec.

31, 2019), *report and recommendation adopted*, 2020 WL 877035 (D. Mass. Jan. 30, 2020)

(applying Massachusetts law); *see also Mohsen v. Veridian Credit Union*, 733 F. Supp. 3d 754,

763 (N.D. Iowa 2024) (collecting cases wherein courts have found a common law duty to protect

private data even outside of the employee-employer context). These courts recognize this duty

under general common law principles, often explaining that a duty can be created when the risk

of injury is foreseeable, and where the relationship between the parties puts one party (e.g., the

employer) in the best position to protect against that foreseeable risk of harm to the other party

(e.g., the employee). *See, e.g.*, *Sackin*, 278 F. Supp. 3d at 748; *Portier*, 2019 WL 7946103, at

*11–12.  Along those lines, a duty may be created where an employee is required to entrust their

PII to their employer, and courts have found that the employer assumes a duty to protect that

information under those circumstances. *See Haney*, 747 F. Supp. 3d at 1111; *Mackey*, 2021 WL

3363174, at * 7; *Castillo v. Seagate Technology, LLC*, No. 16-cv-01958-RS, 2016 WL 9280242, *4 (N.D. Cal. Sept. 14, 2016). Courts recognizing such a duty have also emphasized that, while there is generally no duty to protect against the criminal acts of a third person, an exception exists if that harm is foreseeable. *See, e.g.*, *Portier*, 2019 WL 7946103, at *12.

In predicting how North Carolina might rule on this same issue, the Court notes that North Carolina courts also recognize these same common law principles. For example, under North Carolina law, the duty of ordinary care extends to "causes of injury that were reasonably foreseeable and avoidable through the exercise of due care." *Fussell v. N.C. Farm Bureau Mut. Ins. Co.*, 695 S.E.2d 437, 440 (N.C. 2010) (citations omitted); *see also Haynes v. Rocky Mount Cycles, Inc.*, 730 F. Supp. 3d 206, 213 (E.D.N.C. 2025).  And while North Carolina recognizes that "[t]he criminal acts of a third party are generally considered unforeseeable and independent," thereby absolving a defendant of liability, it also recognizes that the "common law may allow a defendant to be held liable for the criminal acts of a third party in cases of special relationships." *Bridges v. Parrish*, 742 S.E.2d 794, 796–97 (N.C. 2013) (cleaned up) (citations omitted); *see also Keith v. Health-Pro Home Care Servs., Inc.*, 873 S.E.2d 567, 574 (N.C. 2022). Moreover, North Carolina recognizes a "voluntary undertaking" doctrine, arising "from 'the basic rule of the common law which imposes on every person engaged in the prosecution of any undertaking an obligation to use due care.'" *Lampkin ex rel. Lampkin v. Housing Management Resources, Inc.*, 725 S.E.2d 432, 438 (N.C. Ct. App. 2012) (quoting *Pinnix v. Toomey*, 87 S.E.2d 893, 897 (N.C. 1955)); *see also McCants v. Nat'l Collegiate Athletics Ass'n*, 201 F. Supp. 3d 732, 738–39 (M.D.N.C. 2016).[11] Thus, the Court concludes that North Carolina, in applying these common law principles as other states have, would likewise find that an employer owes a

---

[11] The Court makes no ruling as to whether the voluntary undertaking doctrine would apply in this case.

duty to safeguard its employees' sensitive personal information under the facts of the present case.

Moreover, while North Carolina courts have not directly addressed this issue, the United States District Court for the District of New Jersey addressed the issue in a case involving North Carolina citizens, as well as citizens of other states. *See In Am. Med. Collection Agency, Inc. Customer Data Breach Litig.*, No. 19-md-2904, 2021 WL 5937742, at *1 (Dec. 16, 2021). While that court declined to engage in a choice-of-law analysis at the motion to dismiss stage, it did conclude that the plaintiffs "stated a claim for negligence under any potentially applicable state law." *Id.* at *14. As for the duty alleged, the court concluded that, once the defendants collected the plaintiffs' personal information, "they had a duty to protect [the plaintiffs] from foreseeable harm by taking reasonable precautions to safeguard that information." *Id.*

Additionally, in at least one case, the United States District Court for the Western District of North Carolina declined to dismiss negligence and breach of implied contract claims premised on the defendant-employer's alleged duty to exercise reasonable care in protecting its employees' confidential information. *Curry v. Schletter Inc.*, No. 1:17-cv-0001-MR-DLH, 2018 WL 1472485, at *4 (W.D.N.C. Mar. 26, 2018). While that court did not consider whether North Carolina recognized such a duty, it was "satisfied that the [p]laintiffs [had] adequately stated a cause of action arising from the [d]efendant's breach of a duty to safeguard their employees' confidential information." *Id.*

Simply put, many states appear to recognize an employer's duty to safeguard its employees' sensitive personal information under general common law principles, even where no such duty is imposed by statute. Beyond citing a small number of distinguishable cases, Pharm-Save has provided no law or authority suggesting that North Carolina's courts would decline to

recognize such an exception. Indeed, it has failed to cite any case law in which a North Carolina court (or a federal court interpreting North Carolina law) suggests that the state would be unwilling to recognize this type of common law duty, nor does it cite to any case law out of the Fourth Circuit suggesting as much. Stated another way, Pharm-Save has failed to cite any authority suggesting that North Carolina courts might rule differently than Kentucky courts on this issue. Indeed, Pharm-Save has failed to identify any area of North Carolina negligence law that conflicts with Kentucky law in any material way.

Otherwise, Pharm-Save relies exclusively on the fact that North Carolina's legislature requires only a duty to notify, as opposed to a duty to protect or safeguard sensitive information. But courts have consistently found such a duty grounded in the common law, not statute, as explained above. For example, those cases applying Kentucky law have not relied on any such statutory obligation and have instead found the duty to exist under common law. *See Brooks*, 732 F. Supp. 3d at 779; *McKenzie*, 369 F. Supp. 3d at 818. And importantly, North Carolina recognizes the same general common law principles under which this duty has arisen. *See, e.g.*, *Fussell*, 695 S.E.2d at 440; *Bridges*, 742 S.E.2d at 796–97. Thus, North Carolina courts would likely find that this common law duty exists under the facts of this case.

Accordingly, the Court cannot find that "the applicable law from each jurisdiction provides different substantive rules, the differences are relevant to the issue at hand, and the differences must have a significant possible effect on the outcome of the trial." *French*, 2008 WL 2788511, at *6 (quoting *@Wireless Enters., Inc.*, 2006 WL 3370696, at *4) (internal quotations omitted). Pharm-Save has failed to identify a true conflict between Kentucky and North Carolina law on this issue, and from what the Court can tell, there does not appear to be any such conflict

in the law at this time. Certainly, there is no conflict between the two states' general negligence law (i.e., the elements of duty, breach, causation, and damages).

Given the lack of a true conflict between the laws of the two states, the Court will apply the law of Kentucky, the forum state. *See Williams v. Toys "R" Us*, 138 F. App'x 798, 803 (6th Cir. 2005) ("Because there is no conflict of laws . . . , we therefore conclude that the district court did not err in applying [the forum state's law] in this case."). As the Court has already explained, Kentucky recognizes an employer's duty to safeguard its employees' personal information under the facts of this case. Because Pharm-Save's sole argument in support of its Motion for Partial Summary Judgment was that no such duty existed under the law, the Court will deny the motion.

On the other hand, if there were a true conflict between Kentucky and North Carolina law, the Court would then have to consider the applicable choice of law principles to determine if Kentucky law should nevertheless apply. *Corder*, 272 F.R.D. at 211. In doing so, this Court, sitting in diversity, would apply the choice-of-law rules of the forum state, Kentucky. *See Eakes v. Caudill*, No. 23-5255, 2023 WL 6236747, at *2 (6th Cir. Sept. 13, 2023) (citing *Boling v. Prospect Funding Holdings,* LLC, 111 F. App'x 562, 573 (6th Cir. 2019)). In tort cases, Kentucky will apply its own law "if there are significant contacts—not necessarily the most significant contacts—with Kentucky." *Mem'l Hall Museum, Inc. v. Cunningham*, 455 F. Supp. 3d 347, 358 (W.D. Ky. 2020) (quoting *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972)). As already noted, it is not clear to the Court that there are "significant contacts" with Kentucky in this case, at least with respect to the North Carolina plaintiffs. The Court makes no ruling on that issue, however. Even assuming that North Carolina law applies to the North Carolina plaintiffs, the Court could not find under the current state of the law, and with the record before it, that

Pharm-Save did *not* owe a duty of care to its employees to safeguard their sensitive personal information under North Carolina law. As already explained, the Court predicts that North Carolina courts *would* recognize this duty under the facts of this case.

Accordingly, regardless of whether this Court applies Kentucky or North Carolina law to Plaintiff's negligence claims, it would not find that Pharm-Save is entitled to judgment as a matter of law as to those claims. On this point, the Court again notes that Pharm-Save's analysis of the negligence claims is limited only to whether, under the laws of North Carolina, it owed a duty to its employees to safeguard their PII. It does not argue that, even if the law recognizes this duty, Pharm-Save did not owe any such duty under the specific facts of this case, nor does it challenge any other elements of Plaintiffs' negligence claims (breach, causation, or damages). Accordingly, to the extent the Court considers whether summary judgment would be appropriate under either state's laws, its analysis is similarly limited to the question of whether the law recognizes an employer's duty to safeguard its employees' personal information. Because Kentucky courts do recognize such a duty, and the Court predicts that North Carolina would also recognize that duty, Pharm-Save's Motion for Partial Summary Judgment will be denied.

### B. Pharm-Save's Motion to Alter or Amend, [R. 198]

#### 1. Legal Standard

Pharm-Save next seeks to amend the class definition, citing Federal Rule of Civil Procedure 23(c)(1)(C). [R. 198-1, p. 2]. That rule provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment." Fed R. Civ. P. 23(c)(1)(C). Plaintiffs, on the other hand, argue that Pharm-Save is actually asking the Court to reconsider its class certification decision. [R. 209-2, p. 3]. As such, Plaintiffs argue, the applicable rule is

Federal Rule of Civil Procedure 59(e), which governs motions to reconsider. *Id.* The Court therefore briefly considers which rule governs Pharm-Save's motion.

First, it is unclear whether Rule 59(e) is applicable where the underlying order is interlocutory in nature. That rule typically applies only to final judgments and allows a party to move to alter or amend such a judgment within twenty-eight days after its entry. *See* Fed. R. Civ. P. 59(e); *Adkisson v. Jacobs Engineering Group, Inc.*, 36 F.4th 686, 694 (6th Cir. 2022) (explaining that Rule 59(e) was not applicable to motion to reconsider an interlocutory order). Here, the order at issue was not a final judgment. *See Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 64 F.4th 731, 734–35 (6th Cir. 2023) (noting that "a class certification decision is not a final order" (citation omitted)). Nevertheless, this Court has previously applied Rule 59(e) when considering a motion to reconsider an order granting class certification. *See Khaliel v. Norton Health Care Inc. Ret. Plan*, 287 F.R.D. 511, 511 (W.D. Ky. 2012), *vacated on other grounds by Clemons v. Norton Healthcare Inc. Ret. Plan*, 890 F.3d 254 (6th Cir. 2018). Regardless, even if the Court views its order granting class certification as a final order, a Rule 59 motion would not have been timely.[12]

However, Rule 54(b) allows interlocutory orders to "be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." *See* Fed. R. Civ. P. 54(b); *Stinson v. Dorsey*, No. 21-2759-SHM-tmp, 2022 WL 22771889, at *2 (W.D. Tenn. Dec. 2, 2022) (discussing Rule 54(b)'s application to interlocutory orders). And courts within this circuit have utilized this rule when deciding motions to reconsider class certification orders. *Jefferson v. Gen. Motors, LLC*, No. 2:20-cv-02576-JPM-tmp, 2023 WL 5662596, at *2

---

[12] Given the interlocutory nature of the Court's order, Rule 60, which allows a party to seek relief from "a *final* judgment, order, or proceeding" "within a reasonable time," also appears inapplicable. *See* Fed R. Civ. P. 60(b) (emphasis added); Fed. R. Civ. P. 60(c)(1).

(W.D. Tenn. Aug. 31, 2023). Regardless, courts considering Rule 54(b) motions generally apply the same standard applicable to Rule 59 motions, that is, the courts "'will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice.'" *Stinson*, 2022 WL 22771889, at *2 (quoting *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004)); *see also Hossfeld v. Allstate Ins. Co.*, No. 20-CV-7091, 2024 WL 325337, at *3 (N.D. Ill. Jan. 29, 2024) ("[C]ourts ordinarily apply the Rule 59(e) standard to Rule 54(b) motions to reconsider an interlocutory order." (citations omitted)).

A similar standard applies to Rule 23(c)(1)(C) motions. As noted above, that rule provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment." Fed R. Civ. P. 23(c)(1)(C). Indeed, "[d]istrict courts have the discretion and even the obligation to reassess their class rulings as the case develops." *Pansiera v. Home City Ice Co.*, 341 F.R.D. 223, 236 (S.D. Ohio 2022) (quoting *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 302 F.R.D. 448, 459 (N.D. Ohio 2014)) (internal quotation marks omitted); *see also Durand v. Hanover Ins. Grp., Inc.*, 294 F. Supp. 3d 659, 673 (W.D. Ky. 2018) (explaining that "district courts have an ongoing duty to assess the propriety of class certification and they must be prepared under Rule 23(c) to alter or amend the class certification as necessary" (citations omitted)); *Powers v. Hamilton Cnty. Pub. Def. Com'n*, 501 F.3d 592, 619 (6th Cir. 2007) ("[D]istrict courts have broad discretion to modify class definitions." (citations omitted)).

However, "Rule 23(c)(1)(C) is triggered by the development of more facts that may render the original determination unsound." *Durand*, 294 F. Supp. 3d at 673 (citation omitted); *see also In re Whirlpool*, 302 F.R.D. at 460 ("Sometimes . . . developments in the litigation, such

as the discovery of new facts or changes in parties or in the substantive or procedural law, will
necessitate reconsideration of the earlier order and the granting or denial of certification or
redefinition of the class." (quoting *Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473, 447 (D. Colo.
1998))) (internal quotation marks omitted). District courts in this and other circuits have
therefore declined to revisit the question of class certification where "the underlying facts and
circumstances pertinent to" the plaintiffs' claims had not changed "in any way that would alter
materially the reasoning on which the Court relied" when it last ruled on a motion to certify a
class. *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 16-md-02744, 2024 WL 1142348, at
\*4 (E.D. Mich. Mar. 15, 2024); *see also Stockinger v. Toyota Motor Sales, U.S.A., Inc.*, No. 17-
35, 2020 WL 7314794, at \*2–4 (C.D. Cal. Nov. 30, 2020); *Barton v. RCI, LLC*, No. 10-03657
PGS, 2014 WL 5762214, at \*1–2 (D.N.J. Nov. 5, 2014). And when faced with a Rule
23(c)(1)(C) motion, courts in other jurisdictions have also considered whether reconsideration is
warranted by an intervening change of controlling law, the availability of new evidence, or the
need to correct a clear error of law or prevent manifest injustice. *See Easterling v. Conn. Dept. of
Corr.*, 278 F.R.D. 41, 44 (D. Conn. 2011); *In re J.P. Morgan Chase Cash Balance Litigation*,
255 F.R.D. 130, 133–34 (S.D.N.Y. 2009); 6A *Federal Procedure, Lawyers' Edition*, § 12:292
(2025) ("Even after a class certification order is entered, the judge remains free to modify it,
although the court may not disturb its prior findings absent some significant intervening event or
a showing of compelling reasons to reexamine the question; such reasons may include an
intervening change of controlling law, the availability of new evidence, or the need to correct a
clear error or prevent manifest injustice." (citation omitted)); *see also Kerns v. Caterpillar, Inc.*,
No. 3:06-1113, 2011 WL 1598830, at \*2 n.1, at \*6 (M.D. Tenn. Apr. 27, 2011) (acknowledging
party's argument that no factual or legal developments warranted an amendment to the class

certification order nearly four years into the litigation, explaining that the court's analysis must be guided by the unique facts and equities of the case, and ultimately declining to amend where discovery did not warrant modification of the scope of the class).

Thus, regardless of whether the Court considers Pharm-Save's motion under Rule 59(e), Rule 54(b), or Rule 23(c)(1)(C), the standard is largely the same. Essentially, the Court must consider whether Pharm-Save has identified developments in the case or law that warrant amendment of the Court's class certification order, specifically, the class definition. *See In re J.P. Morgan Chase Cash Balance Litig.*, 255 F.R.D. at 134 ("The issue thus becomes whether [the plaintiffs] have identified developments in the case that warrant disturbing [the district court's] class certification order."). Here, Pharm-Save has not pointed to any change or development in the facts of this case, or any changes in the law, that might warrant modification of the class definition. The Court therefore understands that Pharm-Save believes amendment is necessary to correct a clear error of law or prevent manifest injustice.

For the reasons set forth below, whether considered under Rule 59(e), Rule 54(b), or Rule 23(c)(1)(C), the Court finds that modification of the class definition is necessary.

### 2. Modification of the Class Definition

In its March 29, 2024 Memorandum Opinion and Order, the Court granted Plaintiffs' request for class certification and defined the class as follows:

> All persons who, like ANDREA SAVIDGE and BETH A. LYNCH, were the victims of the Pharm-Save data security breach that occurred on or about March 3, 2016, wherein their sensitive and personal data was compromised, *and who suffered an actual, present injury from the breach, or who otherwise incurred cost or lost time mitigating the risk of future harm resulting from that data breach*.

[R. 190, p. 45 (emphasis added)]. The Court essentially added the above-italicized language to Plaintiffs' proposed class definition "to ensure that each class member may ultimately

demonstrate standing (i.e., a cognizable injury in fact), and to avoid eventual 'predominance' issues." *Id.*; *see also id.* at 57–64 (discussing predominance issues).

Pharm-Save now asks the Court to define the class as "[a]ll persons who, like ANDREA SAVIDGE and BETH A. LYNCH, were the victims of the Pharm-Save data security breach that occurred on or about March 3, 2016, wherein their sensitive and personal data was compromised."[13] [R. 198-1, p. 2]. In other words, Pharm-Save asks the Court to remove the above-italicized language and use the original class definition proposed by Plaintiffs. *See* [R. 169-1, p. 16]. In support of this request, Pharm-Save argues that "[t]he Court's class definition is overly broad and sets forth subjective, highly individualized criteria for ascertaining class members." [R. 198-1, p. 2]. Pharm-Save also argues that class membership is dependent on a finding of liability, and as such, Pharm-Save argues, it is "an impermissible 'fail-safe' class." *Id.* at 2, 4.

As courts within this circuit have explained, Rule 23(a), which outlines the prerequisites of class certification, "inherently requires that a class be sufficiently definite." *Schilling v. Kenton Cnty.*, No. 10-143-DLB, 2011 WL 293759, at *5 (E.D. Ky. Jan. 27, 2011) (citing 7A Charles Alan Wright, et al., *Federal Practice and Procedure* § 1760 (3d ed.)). This ensures "that it is administratively feasible for the court to determine whether a particular individual is a member." *Id.* (quoting Wright, et al., *supra*, § 1760). Typically, then, a class action requires "an order defining the class such that its membership may be ascertained in some objective manner." *Id.* (citations omitted). That class definition must "avoid subjective standards such as the

---

[13] Beyond its blanket request to remove all of the above-italicized language, Pharm-Save does not specifically address the "actual, present injury" language of the class definition. Pharm-Save instead focuses on the "who otherwise incurred costs or lost time mitigating the risk of future harm resulting from that data breach" language, and argues that this language creates a fail-safe class, is overly broad, is subjective, and contains highly individualized criteria. *See* [R. 198-1].

plaintiff's state of mind or terms that depend on a merits adjudication." *Id.* For example, in a case involving alleged violations of the plaintiffs' due process rights, the class definition was too general "where it require[d] the [c]ourt to determine whether an individual's constitutional rights ha[d] been violated in order to ascertain membership in the class itself." *Id.* (citing *Catanzano v. Dowling*, 847 F. Supp. 1070, 1078–79 (W.D.N.Y. 1994)).

When the class is "defined by the merits of [the plaintiffs'] legal claims, and [is] therefore unascertainable prior to a finding of liability in the plaintiffs' favor," it is an impermissible fail-safe class. *Id.* at at *6 (quoting *Velazquez v. HSBC Fin. Corp.*, No. 08-4592, 2009 WL 112919, *4 (N.D. Cal. Jan. 16, 2009)); *see also Eversole v. EMC Mortg. Corp.*, No. 05-124, 2007 WL 1558512, at *4 (E.D. Ky. May 29, 2007) ("If the class definition requires a determination on the merits before a member can be identified, the plaintiffs have effectively reinstated 'one-way intervention,' which the 1966 Amendment to Rule 23 was designed to eliminate." (citation omitted)). "A fail-safe class is inherently deficient in that it 'precludes membership unless the liability of the defendant is established.'" *Schilling*, 2011 WL 293759, at *6 (quoting *Kamar v. RadioShack Corp.*, 375 F. App'x 734, 736 (9th Cir. 2010)). In other words, "[a] fail-safe class 'includes *only* those who are *entitled* to relief.'" *Jackson v. Cuyahoga Cnty.*, No. 1:20-CV-02649, 2021 WL 2018853, at *13 (N.D. Ohio May 20, 2021) (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012)). This is in contrast to a properly defined class, wherein the class members have a legal claim, but "might not be entitled to relief due to [certain] affirmative defenses." *Jewell v. Magnolia Bank, Inc.*, No. 3:23-cv-78-RGJ, 2024 WL 203972, at *7 (W.D. Ky. Jan 17, 2024).

Fail-safe classes are "'palpably unfair to the defendant, and [are] also unmanageable' for obvious reasons; not the least which (sic) includes [the defendants'] inability to provide class

notice pursuant to Rule 23(c)." *Schilling*, 2011 WL 293759, at *6 (quoting *Kamar*, 375 F. App'x at 736); *see also Tarrify Props., LLC v. Cuyahoga Cnty.*, 37 F.4th 1101, 1106 (6th Cir. 2022) ("If 'mini-trials' become necessary to determine who is in and who is out, the class-action vehicle imposes inefficiencies rather than ameliorates them." (citation omitted)); *Jackson*, 2021 WL 2018853, at *13 (discussing the reasons why fail-safe classes are prohibited). Moreover, fail-safe classes "allow putative class members to seek a remedy but not be bound by an adverse judgment—either those 'class members win or, by virtue of losing, they are not in the class' and are not bound." *Young*, 693 F.3d at 538 (quoting *Randelman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011)). Thus, this type of class would "fail to provide the final resolution of the claims of *all* class members that is envisioned in class action litigation." *Id.*

Ultimately, "[d]efining a class so as to avoid, on one hand, being over-inclusive and, on the other hand, the fail-safe problem is more of an art than a science." *Jefferson v. Gen. Motors, LLC*, 344 F.R.D. 175, 196 (W.D. Tenn. 2023) (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012)) (internal quotation marks omitted), *modified on reconsideration by* No. 2:20-cv-02576-JPM-tmp, 2023 WL 5662596 (W.D. Tenn. Aug. 31, 2023). [14]

Pharm-Save argues that the class, as presently defined, is a fail-safe class because it "is circularly defined by the merits of the [p]laintiffs' legal claims and is therefore unascertainable prior to a finding of liability and complicity (sic) a complicated factfinding investigation into causation and damages." [R. 198-1, p. 4 (citation omitted)]. As noted above, Pharm-Save also argues that the class definition creates a fail-safe class because it is "overly broad and sets forth

---

[14] On reconsideration, the United States District Court for the Western District of Tennessee found that it had "made an error of law in determining that [the plaintiff's] proposed class was a fail-safe class." *Jefferson*, 2023 WL 5662596, at *2.

subjective, highly individualized criteria for ascertaining class members." *Id.* at 2. To be clear, however, an overly broad class, or one with objective criteria or highly individualized criteria, is not necessarily a fail-safe class. Instead, the Court understands these arguments to go to administrative feasibility. The Court will turn to these administrative feasibility arguments after first addressing Pharm-Save's argument that the class definition creates a fail-safe class.

In support of that fail-safe argument, Pharm-Save relies primarily on *Lindsay Transmission, LLC v. Office Depot, Inc.*, 4:12-CV-221 (CEJ), 2013 WL 275568 (E.D. Mo. Jan. 24, 2013). *See* [R. 198-1, p. 5]. In addition to being out-of-circuit, that case is also distinguishable. That case involved a putative class action regarding alleged violations of the Telephone Consumers Protection Act ("TCPA"), which prohibits persons from sending unsolicited advertisements to fax machines without the receiving party's prior consent or a prior business relationship. *Lindsay Transmission*, 2013 WL 275568, at *3 (citing 47 U.S.C. § 227(b)(1)(C)). The *Lindsay Transmission* plaintiffs proposed the following class:

> All persons who (1) on or after four years prior to the filing of this action, (2) were sent telephone facsimile messages of material advertising the commercial availability of any property, goods, or services by or on behalf of Defendant (3) with respect to whom Defendant cannot provide evidence of prior express permission or invitation for the sending of such faxes, (4) with whom Defendant does not have an established business relationship and (5) which did not display a proper opt out notice.

*Id.*

The trial court found this to be an impermissible fail-safe class. It explained, "In this case, the proposed class includes only those persons to whom [the] defendant sent faxes without prior consent and with whom [the] defendant did not have an established business relationship. Thus, the proposed class consists solely of persons who can establish that [the] defendant violated the TCPA." *Id.* at *4. In other words, the proposed class definition "require[d] addressing the central

issue of liability to be decided in the case" and "require[d] the Court to engage in an improper merits evaluation to determine who is in the class." *Id.* (citation omitted); *see also G.M. Sign, Inc. v. Franklin Bank, S.S.B.*, No. 06 C 949, 2007 WL 4365359, at *3 (N.D. Ill. Dec. 13, 2007) (rejecting, in TCPA case, a proposed class definition that "improperly include[d] a component of a lack of defense, namely proof of express permission or invitation prior to the receipt of the fax," which would require the defendant "to mount a defense before a prima facie case of liability is established"). Moreover, the *Lindsay Transmission* court found, "[d]etermining class membership [would] require the kind of individualized determinations—the absence of prior consent and the absence of a prior business relationship—precluded by Rule 23." *Lindsay Transmission*, 2013 WL 275568, at *5. That court therefore declined to certify the proposed class. *Id.*

In other circumstances, the Sixth Circuit has rejected similar fail-safe arguments, finding instead that membership in the proposed classes could be determined without consideration of the merits. For example, in *Young v. Nationwide Mutual Insurance Co.*, 693 F.3d 532 (6th Cir. 2012), the named plaintiffs claimed that their insurer charged them a local government tax on their premiums when that tax was not owed, or was less than what the insurer billed. *Id.* at 535. The plaintiffs asserted various state law causes of action, including negligence and conversion. *Id.* The district court ultimately certified a class including individuals who "were charged local government taxes on their payment of premiums which were either not owed, or were at rates higher than permitted." *Id.* at 536.

On appeal, the Sixth Circuit explained that this class definition did not create an impermissible fail-safe class because the class "include[s] both those entitled to relief and those not." *Id.* at 538. The Court went on to explain that, to the extent some of the class criteria

> overlap[ped] with a required element of [the plaintiffs'] claims (such as a showing of injury), allowing a determination that an individual was subject to one tax, but was charged a different tax, is no different than determining whether an individual is of a minority race or gender, required elements in class action discrimination cases and most certainly part of the class definition.

*Id.* at 539. Thus, these criteria "are not necessarily determinate of the ultimate issue of liability." *Id.*

This Court and others in this circuit have ruled similarly. *See Jewell*, 2024 WL 203972, at *5–6 (class definition did not create a fail-safe class because "[a] class definition that requires the proposed members of the class to be able to *pursue* a claim for relief is different from requiring them to be *entitled* to relief"); *Jefferson*, 2023 WL 5662596, at *3 (modifying its prior order defining the class, noting that the new class definition requires members "to prove more facts to establish liability than are referenced in the class definition" (quoting *Melgar v. CSK Auto, Inc.*, 681 F. App'x 605, 607 (9th Cir. 2017))); *Lott v. Louisville Metro Government*, 3:19-CV-271-RGJ, 2021 WL 1031008, at *9–10 (modifying class definition to avoid potential fail-safe class).

To the extent Pharm-Save argues that the class definition requires the Court to engage in a merits-based liability determination, the Court finds this case to be more like *Young* and the above-cited district court cases than the out-of-circuit *Lindsay Transmission* case. Here, Plaintiffs assert claims of negligence and breach of an implied contract. To prove negligence, the proof must ultimately demonstrate the existence of a duty, the breach of that duty, causation, and damages. *See Greer*, 401 F. Supp. 3d at 770; *Royal*, 524 S.E.2d at 602. To succeed on an implied contract claim, the proof must demonstrate the existence of an implied contract and a breach of that contract, and resulting damages. *McKenzie*, 369 F. Supp. 3d at 820 (citing to Kentucky law); *Snyder v. Freeman*, 300 N.C. 204, 217–18 (discussing North Carolina law on implied contracts).

Thus, to be *entitled* to relief in this case, the class members will be required "to prove more facts to establish liability than are referenced in the class definition," such as facts relating to causation and the amount damages. *Jefferson*, 2023 WL 5662596, at *3 (quoting *Melgar*, 681 F. App'x at 607) (internal quotation marks omitted). Instead, the class definition merely identifies those who are entitled to *pursue* these claims. *See Jewell*, 2024 WL 2039272, at *6 (citation omitted).

Moreover, to the extent the class criteria overlap somewhat with other required elements of Plaintiffs' claims (i.e., showing injury), it "is no different than determining whether an individual is of a minority race or gender, required elements in class action discrimination cases and most certainly part of the class definition." *Young*, 693 F.3d at 539. In other words, while the criteria might also go to some other element of the plaintiffs' claims, those criteria "are not necessarily determinative of the ultimate issue of liability." *Id.* Other elements must still be proven (e.g., causation, damages), and Pharm-Save may present affirmative defenses. Thus, the "proposed class is not a fail-safe class because all facts that must be determined to establish membership in [Plaintiffs'] proposed class can be objectively determined without any decision on the merits of [their] case." *Jefferson*, 2023 WL 5662596, at *3 (citation omitted).

Having determined that the class definition does *not* create a fail-safe class, the Court next turns to Pharm-Save's administrative feasibility arguments. Among other things, Pharm-Save argues that the class definition is overly broad. [R. 198-1, p. 2]. But Pharm-Save does not expand on this point, and the Court does not understand Pharm-Save's argument to be that the class definition is overly broad. An overly broad class definition "include[s] members who have not suffered harm at the hands of the [d]efendant and are not at risk to suffer such harm." *Jewell v. Magnolia Bank, Inc.*, No. 3:23-cv-78-RGJ, 2024 WL 203972, at *5 (W.D. Ky. Jan. 17, 2024) (citation omitted). Pharm-Save does not argue that the class includes members who have not

suffered harm, or are at no risk of suffering harm. To the contrary, the crux of Pharm-Save's fail-safe argument is that the class definition includes only those entitled to relief, which would necessarily include only those suffering an injury at the hands of the defendant. Moreover, the class definition clearly requires a member to have suffered a concrete injury. *See generally* [R. 190]. Thus, to the extent Pharm-Save argues that the class definition is overly broad, it has failed to support that argument, and the Court otherwise finds it to be without merit.

Next, to the extent Pharm-Save argues that the class definition sets out "subjective and highly individualized criteria," [R. 198-1, p. 2], the Court again disagrees. As to subjective criteria, Pharm-Save has failed to identify any such subjective criteria in the class definition, such as the class members' states of mind. Instead, the class criteria in this case are similar to the "class categories of objective criteria" in the class definition in *Young*, which included "the location of the insured risk/property; the geographical boundaries for the relevant local government; the local tax for a particular taxing district within whose boundaries the insured property is located; and the local tax charged and collected from the policyholder." *Young*, 693 F.3d at 539. More specifically, the class definition in this case (as modified below) requires determining the following facts: whether the class members' sensitive and personal data was disclosed in the March 3, 2016 data breach, and whether the class members suffered a cognizable injury, i.e., an actual, present injury or lost time or money mitigating the risk of future harm. The former is an objective criterion that can be determined using Pharm-Save's own records of affected employees. *See Jefferson*, 2023 WL 5562596, at *3; *see also* [R. 198-1, p. 3]. The latter is also an objective fact that can be determined through self-identification (e.g., affidavits) and verified through third-party records (e.g., records demonstrating the purchase of a credit

monitoring service, a false tax return filing, records of closing a bank account or credit card account).

To the extent some of these objective facts, namely the loss of time, may be difficult to verify with third-party records, affidavits may still be an acceptable way to ascertain class membership on these grounds, as those affidavits can be cross-referenced with the list of affected employees. In other words, the Court would not be forced to rely on affidavits *alone* to determine class membership with reasonable accuracy. *See Rikos v. Proctor & Gamble Co.*, 799 F.3d 497, 524–27 (6th Cir. 2015) (rejecting argument that class, which was made up of anyone who purchased the product, was not ascertainable where the class was defined by objective criteria and could be determined with reasonable accuracy by reviewing the defendant's internal data, supplemented by "receipts, affidavits, and a special master to review individual claims"); *Sandusky Wellness Center, LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 470–73 (6th Cir. 2017) (affirming district court's denial of class certification in TCPA case involving unsolicited faxes, where there were no fax logs available and instead, class membership would have to be determined on affidavits alone, nearly seven years after the unsolicited faxes were sent); *Vandenberg & Sons Furniture, Inc. v. Alliance Funding Grp.*, No. 1:15-CV-1255, 2021 WL 222171, at *6 (W.D. Mich. Jan. 22, 2021) (denying class certification of "Class B" members where no fax logs existed but finding "Class A" members ascertainable where an "opt-out list" existed and the parties could review affidavits "from the fax recipients to assure that they received an unsolicited fax" from the defendant); *see generally Lyngaas v. Curaden AG*, 436 F. Supp. 3d 1019, 1023–24 (E.D. Mich. 2020) (explaining that, at class administration stage of a TCPA class action, class membership determinations would be not be premised solely on claim forms and affidavits, but also on the "target lists" of fax numbers). And importantly, no more

than three-hundred and forty-three employees were affected by the data breach. *See* [R. 169-1, p. 21]; [R. 178, p. 21]. Reviewing, at most, this number of affidavits (but likely fewer) does not render the class member identification process administratively unfeasible, nor does Pharm-Save argue as much. In sum, then, the Court finds that the class criteria are objective. *See generally Young*, 693 F.3d at 538–39 ("In some circumstances, a reference to damages or injuries caused by particular wrongful actions taken by the defendants will be sufficiently objective criterion for proper inclusion in a class definition." (quoting 5 James W. Moore et al., *Moore's Federal Practice* § 23.21[3] (Matthew Bender 3d 3d. 1997)))).

As to whether the class criteria is highly individualized, the Court understands this to be another argument that the class criteria is not administratively feasible. *See id.* at 538. The Sixth Circuit's decision in *In re Sonic Corporation*, No. 20-0305, 2021 WL 6694843 (6th Cir. 2021) addresses this concern. That case involved a data breach, after which various financial institutions sought economic damages incurred after they reissued cards and reimbursed accounts of affected customers. *Id.* at *1. The district court certified a class with the following criteria: (1) "[a]ll banks, credit unions, and financial institutions in the United States"; (2) that "received notice"; (3) that "took action to reissue credit or debit cards or reimbursed a compromised account"; (4) that was involved "in the Sonic Data Breach." *Id.* at *2.

The defendants took issue with the last two criteria, arguing that they required "individualized assessment and self-identification by each plaintiff instead of reference to evidence within [the defendants'] control or that of a third-party." *Id.* The Sixth Circuit disagreed, noting that it had "never rejected self-identification as a means of determining membership when there are records verifying that determination." *Id.* Because the financial institutions could provide information that, when cross-referenced with third parties, could

establish that an institution had been impacted by the breach, and that they reissued cards or reimbursed accounts, the class could be determined using the criteria set out by the district court. *Id.*

The *In re Sonic* defendants also argued that the class was not ascertainable because the various financial institutions would be unable to show that they took action "as a direct result of this breach." *Id.* The Sixth Circuit disagreed, noting that this criterion was not part of the definition, and the "definition is sufficient to determine which financial institutions were harmed by taking action." *Id.* And even though the defendants "contend[ed] that, given the ubiquity of data breaches today, there is no way to determine if the cards reissued or the fraud reimbursed was the result of its data breach, that too goes to causation, not whether a financial institution falls within the class." *Id.*

Relatedly, the Sixth Circuit also addressed the defendants' argument that commonality, typicality, predominance, and superiority could not be established because "individualized issues abound based on a financial institution's response and whether the response was directly attributable to the breach." *Id.* at *3. The Court disagreed, explaining that the elements of the class's negligence claim (i.e., duty, breach, and causation) arose from common questions, and specifically, the issue of whether the financial institutions' actions were prompted by the data breach went "directly to the merits of causation." *Id.* The Court did not need to delve into that merits inquiry, however, because at the certification stage, the plaintiffs needed only to prove that all class members suffered the same injury. *Id.* (citation omitted). In other words, the *fact* of damages was common to the class, even if the *amount* of damages varied from member to member. *Id.* (citation omitted).

In the present case, to the extent Pharm-Save is arguing that the "highly individualized" issues of causation and damages make the class unascertainable, the Court finds the *In re Sonic* analysis instructive. As in that case, the class members in this case can self-identify with individual affidavits, which can then be cross-referenced with Pharm-Save's own records of affected employees and/or verified through third-party records, as already explained. Through this process, class member identification is administratively feasible.

Moreover, while the Court agrees that an individualized inquiry into the merits of causation and/or the *amount* of damages may become necessary at a later stage of this litigation, *see infra* Section II(B)(3), the class definition does not require members to prove the amount of their damages at this time. To prove membership in the class, the class members need only demonstrate that they suffered a cognizable injury, such that they have standing to pursue their claims. They need not engage in a highly individualized assessment of the *amount* of their damages. In other words, "the fact of damages [is] a question common to the class even if the amount of damages sustained by each individual class member varie[s]." *In re Sonic*, 2021 WL 6694843, at *3 (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2007)) (internal quotation marks omitted); *see also* [R. 190, pp. 52–53, 60–64 (explaining why individualized damages and causation issues did not defeat certification)].

However, the Court understands Pharm-Save's concern that class members might be required to demonstrate that they suffered an injury "as a direct result of the breach" in order to be included in the class. *See In re Sonic*, 2021 WL 6694843, at *2. The current class definition requires members to have suffered "an actual, present injury *from the breach*" or to have "incurred cost or lost time mitigating the risk of future harm *resulting from the data breach*." [R. 190, p. 45 (emphasis added)]. To the extent the italicized language might require a highly

individualized inquiry into causation in order to establish class membership, the Court finds that criterion to be inappropriate. *See generally In re Sonic*, 2021 WL 66945843, at *2. Accordingly, the Court will remove the above-italicized language from the class definition.

In sum, to the extent Pharm-Save argues that the class definition creates an improper fail-safe class or is otherwise not administratively feasible because it is overly broad or relies on subjective criteria, the Court disagrees. The Court also disagrees that the class definition requires a highly individualized fact-finding inquiry into the amount of damages; instead, it only requires that each member of the class suffer a cognizable injury. However, to the extent Pharm-Save argues that the class definition is not administratively feasible because it would require a highly individualized inquiry into whether or how each class member took action as a direct result of the breach, the Court will modify the class definition to address that concern. The modified class definition shall read as follows:

> All persons who, like ANDREA SAVIDGE and BETH A. LYNCH, were the victims of the Pharm-Save data security breach that occurred on or about March 3, 2016, wherein their sensitive and personal data was compromised, and who suffered an actual, present injury or who otherwise incurred cost or lost time mitigating the risk of future harm.

While this analysis addresses Pharm-Save's arguments regarding feasibility and the class definition, the Court will also briefly address Pharm-Save's alternative request for bifurcation under Rule 23(c)(4). *See* [R. 198-1, pp. 6–12].

### 3. Bifurcation

Rule 23(c)(4) authorizes "issue certification," or the certification of only certain issues for class treatment. *See* Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."); *Ciccio v. SmileDirectClub, LLC*, No. 3:19-cv-00845, 2024 WL 559235, at *11 (M.D. Tenn. Feb. 12, 2024) ("[A] court may,

where appropriate, certify a Rule 23(c)(4) class that is limited to issues for which shared questions predominate, while leaving aspects of the class members' cases in which unshared issues predominate to be decided separately."); *In re Marriott Int'l, Inc., Customer Data Breach Sec. Breach Litig.*, 341 F.R.D. 128, 167–171 (D. Md. 2022) (discussing and applying Rule 23(c)(4)). As the Court has previously explained, however, some courts have cited Rule 23(c)(4) as the rule authorizing bifurcation of damages or other individualized issues in class action lawsuits. *See* [R. 190, pp. 60–61]; *Olden v. LeFarge Corp.*, 383 F.3d 495, 509 (6th Cir. 2004). Other courts discuss the bifurcation of damages issues in a class action lawsuit without reference to Rule 23(c)(4). *In re Sonic*, 2021 WL 6694843, at *3; *Klender v. United States*, 218 F.R.D. 161, 168 (E.D. Mich. 2003); *Sutton v. Hopkins Cnty.*, No. 4:08CV-003-M, 2007 WL 119892, at *8 (W.D. Ky. Jan. 11, 2007). Regardless, in class action lawsuits, "[l]iability and damages phases of litigation are generally bifurcated," and the Court clearly has the authority to order such bifurcation when appropriate. *Little Caesar Enters, Inc. v. Smith*, 172 F.R.D. 236, 245 (E.D. Mich. 1997); *see also Burkhead v. Louisville Gas & Elec. Co.*, 250 F.R.D. 287, 299 (W.D. Ky. 2008) ("[C]ourts often bifurcate class action proceedings, adjudicating liability on a classwide basis, and then 'if liability is found, the issue of damages can be decided by a special master or by another method.'" (quoting *Olden*, 383 F.3d at 509)).

In the present case, Pharm-Save asks that, if the Court declines to redefine the class, it instead bifurcate the issues of causation and damages. [R. 198-1, p. 7]. As to these issues, Pharm-Save argues that determining which individuals suffered an injury and which incurred costs or lost time mitigating the risk of future harm will require "highly individualized factfinding." *Id.* at 9. Pharm-Save also argues that determining which class members suffered such injury as a result of the data breach will similarly require "extensive, highly individualized factfinding." *Id.* at 12.

"This work," Pharm-Save argues, "should not be undertaken at this stage of identifying class members, but only after there has been some determination of liability based on the common questions of law and fact." *Id.*

To the extent Pharm-Save argues that such individualized criteria should be removed from the class definition, the Court has already addressed those concerns above. Simply put, class members need not prove the amount of damages at this time, and the potentially problematic "resulting from" language has been removed from the class definition, such that causation does not need to be established in order to determine class membership. Nevertheless, the Court notes (and Plaintiffs agree) that bifurcation of certain issues may still be appropriate. *See* [R. 209-2, p. 13 (noting that "bifurcation—or something like it—may be necessary to try this action")].

On this issue, the Court again finds *In re Sonic* to be instructive. As noted above, the defendants in that case argued that commonality, typicality, predominance, and superiority could not be established because "individualized issues abound based on a financial institution's response and whether the response was directly attributable to the breach." *In re Sonic*, 2021 WL 6694843, at *3. The Sixth Circuit explained that, where issues of liability did not differ dramatically from one plaintiff to the next, the question of liability may be tried as a class action, while individualized issues of damages may be reserved for individual treatment.[15] *Id.*; *see also id.* (explaining that the "merits of causation . . . need only be considered at the certification stage to the extent they are relevant to determining if the Rule 23 prerequisites for certification are satisfied").

---

[15] The Court has already addressed the commonality, typicality, predominance, and superiority factors of Rule 23 in its Memorandum Opinion and Order certifying the class. *See* [R. 190, pp. 47–53, 57–65]. At the time, neither party requested bifurcation of any issues.

This Court explained as much in its Memorandum Opinion and Order certifying the class. [R. 190, pp. 60–61]. There, the Court explained that variations in damages typically do not prevent class certification; instead, as the Sixth Circuit has explained, "Rule 23 permits district courts to utilize several solutions to address individualized damages, including bifurcating the issues of liability and damages, utilizing a special master to determine damages, or employing a formula for damage calculation." *Id.* at 61 (quoting *Versen v. City of Detroit*, No. 21-11545, 2023 WL 5042169, at *5 (E.D. Mich. Aug. 8, 2023)).

Now, Pharm-Save asks the Court to bifurcate the issue of liability from the issues of causation and damages. *See* [R. 198-1, pp. 6–12]. More specifically, from the best the Court can tell, it requests a determination on liability first, then consideration of damages. [R. 211, p. 4]. The Court is amenable to such a request, given the individualized nature of the damages issues (including whether some amount of a class member's damages may have been caused in part by other data breaches). But Pharm-Save only requests bifurcation as an alternative to modifying the class definition. *See, e.g.*, [R. 198-1, p. 7 ("If the Court is not inclined to modify the class definition, then, in the alternative, the issue of damages must be bifurcated.")]; [R. 211, p. 4 ("In the alternative, Pharm-Save requests that the Court bifurcate the issues of damages.")]. Indeed, the crux of its argument seems to be that certain highly individualized issues (like causation and the amount of damages) are inappropriate criteria for the *class definition*, and this can be solved by *either* amending the class definition or bifurcating the those issues from the issue of liability.

The Court has already modified the class definition to remove any reference to causation, and that definition does not require any individualized inquiries into the amount of damages, as already explained. As such, the Court will not rule on Pharm-Save's alternative bifurcation request at this time. However, given that certain damages issues may require highly

individualized inquires *if* liability is proven, the Court's decision does not foreclose the possibility of bifurcation (or some similar mechanism) in the future. And because Plaintiffs suggest that they too might agree to bifurcation (or something similar) as the litigation progresses, the Court would encourage the parties to first meet and confer on this issue to determine if they can agree on a procedure. If no such agreement can be reached, the Court would entertain a motion for bifurcation or a similar procedural mechanism at the appropriate time.

### 4.  Other Considerations

The above analysis addresses the primary arguments made in Pharm-Save's motions. For all the reasons explained, the Court disagrees with Pharm-Save's contention that the class definition, as modified by the Court, creates a fail-safe class, or that it is overly broad or consists of subjective and highly individualized criteria (with the exception of the potentially problematic "resulting from" language referenced above). Notably, in making these arguments, Pharm-Save asked the Court to amend the class definition to a version that is nearly identical to the definition originally proposed by the plaintiffs. Plaintiff's proposed class definition read:

> All persons who, like ANDREA SAVIDGE and BETH A. LYNCH, were the victims of a data security breach that occurred on or about March 3, 2016, wherein their sensitive and personal data was compromised.

[R. 169-1, p. 16 (Plaintiff's original proposed class definition)]. Pharm-Save's proposed definition similarly reads:

> All persons who, like ANDREA SAVIDGE and BETH A. LYNCH, were the victims of the Pharm-Save data security breach that occurred on or about March 3, 2016, wherein their sensitive and personal data was compromised.

[R. 198-1, p. 2 (Pharm-Save's proposed class definition)].

In modifying Plaintiff's proposed class definition to include the language "and who suffered an actual, present injury from the breach, or who otherwise incurred cost or lost time mitigating the risk of future harm resulting from that data breach," the Court was attempting to resolve any potential predominance issues and Pharm-Save's standing concerns at the class member identification stage, i.e., in the class definition. However, to the extent that the parties could reach an agreement as to the class definition, the Court is willing to consider any such proposed agreed definition. To address this, the Court will conduct a telephonic conference with the parties.

## III.  CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** as follows:

1.  Defendant Pharm-Save, Inc's Motion for Partial Summary Judgment on Plaintiffs' Negligence Claim, [**R. 197**], is **DENIED**.

2.  Defendant Pharm-Save, Inc.'s Motion to Alter or Amend Order Granting Class Certification or, in the Alternative, to Bifurcate the Issue of Damages, [**R. 198**], is **GRANTED IN PART** and **DENIED IN PART**.

    a.  The motion is **GRANTED** to the extent Pharm-Save requests removal of the potentially problematic causation language, as outlined above.

    b.  The motion is **DENIED** in all other respects.

3.  The Court will enter a separate order setting a telephonic conference to address the concerns outlined in this opinion.

This the 31st day of March, 2025.

*Claria Horn Boom*

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY